UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES LEE DOTSON,<br><br>                Petitioner,<br><br>    v.<br><br>TIM PEREZ,<br><br>                Respondent. | Case No. CV 13-3211-JEM<br><br>MEMORANDUM OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |

**PROCEEDINGS**

On May 6, 2013, Charles Lee Dotson ("Petitioner"), a prisoner in state custody, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254 ("Petition"). On June 6, 2013, Respondent[1] filed a Motion to Dismiss the Petition on the ground that Petitioner failed to name a proper respondent. The District Judge issued an order granting the Motion to Dismiss and dismissing the Petition with leave to amend on November 6,

---

[1] Tim Perez, the Acting Warden of the California Institution for Men in Chino, California, where Petitioner is currently incarcerated, is substituted for his predecessor named in the First Amended Petition. See Fed. R. Civ. P. 25(d).

1  2013. (Docket No. 14.) On November 21, 2013, Petitioner filed a First Amended Petition
2  ("FAP") and a supporting Memorandum of Points and Authorities ("Memo.").

3  On February 24, 2014, Respondent filed an Answer to the FAP. Petitioner did not file
4  a Reply.

5  The parties have consented to proceed before the Magistrate Judge.

## BACKGROUND

Following a jury trial in Los Angeles County Superior Court case number SA072408, Petitioner was convicted of insurance fraud by presenting false and fraudulent claims (Cal. Penal Code § 550(a)(1); count 2); insurance fraud by presenting multiple claims for the same loss (Cal. Penal Code § 550(a)(2); count 3); and insurance fraud for failing to disclose the occurrence of an event that affected a person's right to an insurance benefit (Cal. Penal Code § 550(b)(3); count 4). (Respondent's Lodged Document ("LD") E, Clerk's Transcript ("CT") at 176-78.) Petitioner admitted that he had suffered one prior serious or violent felony conviction (Cal. Penal Code § 667(b)-(i) and 1170.12(a)-(d)). (CT at 211.) The trial court sentenced Petitioner to a total term of four years in state prison. (CT at 210; LD F, Reporter's Transcript on Appeal ("RT") at 389.)

Petitioner appealed his conviction.[2] (LD A.) On February 6, 2013, the California Court of Appeal affirmed the judgment. (LD C.) Petitioner filed a petition for review in the California Supreme Court. On May 15, 2013, the California Supreme Court denied the petition. (LD D.)

///

---

[2] Prior to his appeal, Petitioner filed a habeas petition in the California Court of Appeal, which was denied on December 6, 2011. (LD G.) On February 1, 2012, Petitioner filed a habeas petition in the California Supreme Court, which was denied on May 9, 2012. (LD H.)

## SUMMARY OF EVIDENCE AT TRIAL[3]

**Prosecution case**

The prosecution's case was based on the theory that defendant established three insurance policies on the same items of jewelry, then claimed that the jewelry was stolen on one date in a burglary, and on another date in a robbery.

On August 21, 2007, Hernan Golbert (Golbert) of 18 Karat Appraisers completed a jewelry appraisal for defendant. The appraisal pertained to five pieces of jewelry: (1) a white gold diamond ring valued at $7,000; (2) another white gold diamond ring valued at $5,400; (3) a white gold diamond bracelet valued at $25,800; (4) a white gold diamond pendant and necklace valued at $1,350; and a white gold diamond Rolex wristwatch valued at $16,000.

Defendant lived in a home in Lancaster which was purchased by his brother, Mark Watts (Watts). Watts bought a homeowner's insurance policy on the Lancaster home with Wawanesa Insurance (Wawanesa). Defendant later added the two rings and the pendant to the Wawanesa policy, based on the appraisal. Defendant also obtained an insurance policy from Farmers Insurance for two rings and a Rolex watch. He obtained surplus insurance coverage with Sutter Insurance (Sutter) to cover the white gold diamond bracelet and the white gold

---

[3] The Court quotes directly from the California Court of Appeal's statement of facts in its opinion affirming Petitioner's conviction. The Court "presume[s] that the state court's findings of fact are correct unless Petitioner rebuts that presumption with clear and convincing evidence. Petitioner has not . . . overcome the presumption with respect to the underlying events. [The Court] therefore rel[ies] on the state court's recitation of the facts." Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008) (citations omitted), cert. denied, 555 U.S. 1112 (2009); 28 U.S.C. § 2254(e)(1). "This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court." Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by, 253 F.3d 1150 (9th Cir. 2001); Pollard v. Galaza, 290 F.3d 1030, 1035 (9th Cir.), cert. denied, 537 U.S. 981 (2002).

diamond pendant. The effective date of the Sutter policy was September 20, 2007.

### The September 21, 2007 burglary

On September 21, 2007, defendant was the victim of a residential burglary at the Lancaster residence. He initially reported the incident to law enforcement, but Watts, who was not living at the Lancaster home at the time, spoke with the sheriffs who came to the house. Watts didn't really know what had been stolen, so he had defendant make a list. Watts signed the list, and he and defendant had it notarized.

Wawanesa had an independent claims investigator, Carl Scholten (Scholten), investigate the claim of loss related to the burglary. On October 7, 2007, Scholten went to the Lancaster residence to investigate the claim. When he arrived, he spoke with defendant, who introduced himself as "Mark Watts" and held himself out to be Watts.

However, Watts testified that he was present at the house when Scholten came to investigate the burglary. According to Watts, he introduced himself as "Mark Watts" to Scholten, and informed Scholten that he was sick with high blood pressure and the flu, so defendant would talk on his behalf during the inspection.

Defendant showed Scholten around the house and showed him the forced entry locations. Scholten took a recorded statement, so that he could have a complete inventory. Defendant also made a personal loss claim worksheet with Scholten. Scholten prepared the list based on his discussion with defendant and the notes taken from the recorded statement. Defendant claimed that he had lost one 18 karat diamond and platinum bracelet, one 16 karat diamond and platinum ring, one 14 karat white gold diamond ring, one 14 karat white gold ring, one 14

karat white gold diamond cross necklace, and two diamond stud earrings.

On March 5, 2008, defendant was examined under oath by Heather Kirby (Kirby), a fraud investigator for Wawanesa Insurance. During the examination, defendant admitted that he added jewelry to his Wawanesa homeowner's policy. The items were a diamond pendant with a chain and two diamond men's rings. Defendant was shown the appraisal from 18 Karat Appraisers, and he confirmed that the pendant and rings described on the appraisal were the items that were added to the Wawanesa policy. Defendant claimed he was not aware of any other policies that covered this jewelry.

Defendant was shown the sworn statement of loss signed by Watts on October 1, 2007. Defendant stated that the two diamond rings listed on the statement of loss were the same ones appraised by 18 Karat Appraisers. Defendant stated that a diamond bracelet, which was not covered by the Wawanesa policy, was also stolen. When he was asked why it was not listed on the sworn statement of loss, he stated that he had intended it to be there. There were other items that defendant claimed should have been listed on the sworn statement of loss, including a vase, an egg, and a Rolex watch valued at $15,000 to $16,000.[FN2]

> [FN2] Kirby testified that it is customary that all stolen items, whether or not covered by the policy, should be noted when reviewing a claim.

During cross-examination of Kirby, defendant's attorney suggested that it was unclear whether defendant's testimony indicated that he was claiming that the Rolex watch was stolen or whether the stolen watch was a different watch, made by Guess. In addition,

defendant's trial attorney suggested that defendant had in fact claimed that both watches were missing prior to the burglary. Kirby testified that she thought defendant stated that the vase, the egg and the Rolex should have been on the inventory of loss, but she would have to review his testimony to be sure. In addition, Kirby confirmed that when defendant was asked about the description of the bracelet that was stolen, he stated he did not know.

During the March 2008 examination under oath, defendant was asked about a claim made to Farmers Insurance and/or Sutter Insurance. Defendant stated that the claim to Farmers and Sutter did not involve the same jewelry.

Wawanesa Insurance eventually denied the claim for personal property to Watts and defendant.

### The December 6, 2007 robbery

On December 6, 2007, defendant claimed that he was the victim of a robbery. Los Angeles Police Officer Erik Mejia testified that defendant came into the police station at approximately 2:50 a.m. on that date. Defendant reported that he had been robbed while changing a flat tire on his vehicle in the area of 112th Street and Compton Boulevard. Defendant stated that two individuals approached him and asked if he needed help changing the tire. When he responded that he did not, one of the individuals stuck a hard object in his back, which he assumed was a handgun, and told him "if you don't give me your money, I will shoot you." Defendant removed his jewelry and gave it to the robber. One of the robbers reached into defendant's back pocket, removed his wallet, and took a ring from his hand. In addition to the wallet and the ring, defendant informed the officer that an additional ring and a watch were taken. Defendant stated that the two rings were

worth $25,000, the watch was worth $25,000, and the wallet was worth $10. He did not mention to Officer Mejia that he had lost any cash or a diamond bracelet.

Defendant made a claim to Sutter Insurance concerning the alleged robbery. Elaine Jackson (Jackson) was hired by Sutter to investigate the claim. Jackson was aware that Sutter insured for defendant a white gold diamond bracelet valued at $25,800 and a white gold diamond pendant valued at $1,350. The two items had been appraised by 18 Karat Appraisers. The claim that Sutter received from defendant was for the theft of the diamond bracelet.[FN3]

> [FN3] Jackson also explained "how and why" defendant obtained insurance coverage for these two pieces of jewelry from Sutter Insurance. Defendant explained that he toured with certain rap stars and musicians, and he would acquire jewelry through this occupation. People advised him that he should have insurance to protect himself. He informed Jackson that he had a tenant homeowner policy through Farmers Insurance, but that they would only cover a certain dollar amount of jewelry. The Farmers agent told him he would have to obtain a floater for the larger dollar amounts, particularly the bracelet.

On January 10, 2008, Jackson met with defendant at which time defendant described the circumstances of the alleged robbery. He said that the items taken from him were a gold Rolex watch, a gold diamond cluster ring from his left pinky, the bracelet insured through Sutter, and a white gold and diamond ring from his right pinky. Defendant also said he had six $100 bills in his wallet which was taken. Defendant stated that the value of the watch was $16,000. Defendant informed Jackson

1 that his Farmers Insurance policy "insured the watch and the two pinky
2 rings."
3   During the meeting, Jackson showed defendant the appraisal
4 form from 18 Karat Appraisers. Defendant confirmed that the items
5 listed in the appraisal were the items stolen from him during the
6 robbery, with the exception of the pendant valued at $1,350. Defendant
7 stated he was not wearing the pendant when he was robbed. When
8 Jackson asked to see the pendant defendant replied that he was not
9 sure where it was at the time.
10   At some point, Jackson became concerned that the bracelet
11 which defendant was claiming as a loss through Sutter had been
12 claimed as a loss through another insurance company, Wawanesa.
13 Jackson developed this suspicion based on notifications to the
14 Insurance Service Index Bureau that serves the insurance industry. On
15 November 23, 2008, Jackson met again with defendant for an
16 examination under oath. At the examination, defendant stated that the
17 two bracelets were not the same and that he could get paperwork to
18 show that the two bracelets were different. He never provided any such
19 paperwork.
20   To Jackson's knowledge, Sutter did not pay defendant's claim on
21 the insured bracelet.
22   With regard to the robbery, defendant spoke twice with Los
23 Angeles Police Sergeant Adrian Koval. They first spoke by telephone
24 on December 23, 2007. Sergeant Koval could not recall if defendant
25 informed him of what was taken during that initial call. On January 23,
26 2008, defendant again spoke with Sergeant Koval. At that time,
27 defendant told Sergeant Koval that two rings, a wallet, and a watch
28 were taken from him. He did not mention that a bracelet or any cash

had been taken. However, later defendant informed Sergeant Koval that a bracelet had been taken, and that it should have been in the original report.

Defendant also spoke with investigator Albert Abolos (Abolos), with I.C.S. Merrill, an investigation corporation on January 23, 2008, regarding the alleged robbery. Defendant informed Abolos that the robbers had demanded his jewelry and also removed his wallet from his back pocket. Defendant specified that his California driver's license and $800 cash were in the wallet.

When Abolos first met with defendant, he found it odd that defendant used his California driver's license to identify himself, since he also claimed it was taken from him in the robbery. Abolos noted that the issue date on the driver's license was July 2007, a date that preceded the alleged robbery. Abolos inquired of defendant as to how he had the driver's license. Defendant replied that he was a bounty hunter and would get in foot chases with bad guys, during which he would lose his license or his wallet, and later would get it back. Defendant added that he had numerous drivers licenses that had been lost and replaced over the years.

**Defense case**

The defense made a motion to exclude references that defendant held himself out to be his brother, Mark Watts, on relevance grounds. The prosecution opposed it on the ground that one of the insurance policies was in Watt's name, and defendant held himself out to be Watts with investigators. The motion was denied.

Defendant did not testify and presented no witnesses in his defense.

(LD C at 3-8.)

**PETITIONER'S CONTENTIONS**

Trial counsel was ineffective, in violation of the Sixth Amendment, because she failed to subpoena Adell Nicholas, a witness whose testimony "could have cleared [Petitioner]." (FAP at 5; Memo. at 1-3.)

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the Court's consideration of Petitioner's cognizable federal claims. 28 U.S.C. § 2254(d), as amended by AEDPA, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court held that a state court's decision can be contrary to federal law if it either (1) fails to apply the correct controlling authority, or (2) applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. Id. at 405-06. A state court's decision can involve an unreasonable application of federal law if it either (1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. Id. at 407-08. The Supreme Court has admonished courts against equating the term "unreasonable application" with "clear error." "These two standards . . . are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75

(2003). Instead, in this context, habeas relief may issue only if the state court's application of federal law was "objectively unreasonable." Id. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011).

Under AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams, 529 U.S. at 412 ("§ 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence"); see also Andrade, 538 U.S. at 71. If there is no Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam); see also Carey v. Musladin, 549 U.S. 70, 76-77 (2006). A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also Bell v. Cone, 543 U.S. 447, 455 (2005) (per curiam).

Petitioner raised the claim in the instant FAP in his petition for review in the California Supreme Court. (See FAP at 5; LD I). The California Supreme Court's discretionary decision to deny petitioner's petition for review without comment or citation to authority, (see LD D), was not a decision on the merits. See Greene v. Fisher, 132 S.Ct. 38, 45 (2011) (state supreme court's decision not to hear an appeal is not an adjudication on the merits under § 2254(d)(1)); Williams v. Cavazos, 646 F.3d 626, 636 (9th Cir. 2011), overruled on other grounds by Johnson v. Williams, — U.S. —, 133 S.Ct. 1088 (2013) ("[T]he California high court's decision to deny a petition for review is not a decision on the merits, but rather means no more than that the court has decided not to consider the case on the merits."); Camper v. Workers' Comp. Appeals Bd., 3 Cal.4th 679, 689 n. 8 (1992) ("[W]e reiterate the well-established rule in this state that a denial of a petition for review is not an expression of

opinion of the Supreme Court on the merits of the case."). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); accord Medley v. Runnels, 506 F.3d 857, 862 (9th Cir. 2007) (en banc), cert. denied, 552 U.S. 1316 (2008). Thus, in addressing Petitioner's claim, the Court will consider the reasoned opinion of the California Court of Appeal, which denied the claim on the merits. See Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010); Vasquez v. Kirkland, 572 F.3d 1029, 1035 (9th Cir. 2009), cert. denied, 130 S.Ct. 1086 (2010).

## DISCUSSION

**I. PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

In his sole claim, Petitioner contends that trial counsel rendered ineffective assistance, in violation of Petitioner's Sixth Amendment right to counsel, because she failed to call Adell Nicholas as a witness at trial. (FAP at 5; Memo. at 1-3.) For the reasons set forth below, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d).

**A. Applicable Clearly Established Federal Law**

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel." Yarborough v. Gentry, 540 U.S. 1, 4 (2003) (per curiam). To succeed on an ineffective assistance of trial counsel claim, a habeas petitioner must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced the defense. Premo v. Moore, 131 S.Ct. 733, 739 (2011); Strickland v. Washington, 466 U.S. 668, 687 (1984). The petitioner bears the burden of establishing both components. Williams, 529 U.S. at 390-91; Smith v. Robbins, 528 U.S. 259, 285-86 (2000); Strickland, 466 U.S. at 687. "'To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" Richter, 131 S.Ct. at 787 (citation omitted); Moore, 131 S.Ct. at 739. Prejudice "focuses on the question whether counsel's deficient performance renders the

1 results of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell,
2 506 U.S. 364, 372 (1993); Williams, 529 U.S. at 393 n.17.

3     To establish deficient performance, the petitioner must show his counsel "made
4 errors so serious that counsel was not functioning as the 'counsel' guaranteed the
5 defendant by the Sixth Amendment." Strickland, 466 U.S. at 687; Williams, 529 U.S. at 391.
6 In reviewing trial counsel's performance, the Court will "strongly presume[] [that counsel]
7 rendered adequate assistance and made all significant decisions in the exercise of
8 reasonable professional judgment." Strickland, 466 U.S. at 690; Cullen v. Pinholster, 131
9 S.Ct. 1388, 1403 (2011). Only if counsel's acts or omissions, examined within the context of
10 all the surrounding circumstances, were outside the "wide range" of professionally
11 competent assistance, will the petitioner meet this initial burden. Kimmelman v. Morrison,
12 477 U.S. 365, 386 (1986).

13     If the petitioner makes this showing, he must then establish there is a "reasonable
14 probability that, but for counsel's unprofessional errors, the result of the proceeding would
15 have been different." Strickland, 466 U.S. at 694; Pinholster, 131 S.Ct. at 1403. The errors
16 must not merely undermine confidence in the outcome of the trial, but must result in a
17 fundamentally unfair proceeding, Williams, 529 U.S. at 393 n.17; Lockhart, 506 U.S. at 369,
18 and "[t]he likelihood of a different result must be substantial, not just conceivable." Richter,
19 131 S.Ct. at 792; Pinholster, 131 S.Ct. at 1403. However, a court need not determine
20 whether counsel's performance was deficient before examining the prejudice the alleged
21 deficiencies caused the defendant. See Robbins, 528 U.S. at 286 n.14 ("'If it is easier to
22 dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that
23 course should be followed'") (quoting Strickland, 466 U.S. at 697).

24     **B.    The California Supreme Court Did Not Unreasonably Apply *Strickland***

25         **1.    California Court of Appeal Opinion**

26     The California Court of Appeal summarized the facts underlying Petitioner's claim as
27 follows:

28

After the prosecution rested its case, the following colloquy took place:

"[Defendant's counsel]: We're having issues with those witnesses that are on the witness list not being called. This was my concern in the beginning of the trial. . . . [¶] I would like Adell Nicholas here. Can you give me her phone number?

"[Prosecutor]: Adell Nicholas, like I said, I received word due to medical restrictions she's unable to come. I do have her number. If you'd like to call her and confirm, it's fine. But it's my understanding that she was unable to travel from San Diego.

"[Defendant's counsel]: She's in San Diego?

"[Prosecutor]: Yes."

\* \* \*

As set forth above, defendant's trial counsel wanted to call Adell Nicholas (Nicholas), a Wawanesa Insurance adjuster, who was on the prosecution witness list. She was informed that due to medical restrictions, Nicholas could not attend the trial and was given Nicholas's telephone number.

Later, defendant's counsel again stated that she wished to call Nicholas, and admitted that she failed to subpoena this witness, stating, "I failed to properly make sure or subpoena the prosecution witnesses myself in order to ensure their presence." Counsel explained the failure to subpoena Nicholas was due to her understanding that the witness had been subpoenaed to be at trial. Counsel attempted to argue that Nicholas "ha[d not] been released" from her subpoena by the prosecution.

The next day, defendant's counsel confirmed that Nicholas was not able to attend trial. However, she stated that Nicholas did have

14

exculpatory evidence. Counsel explained that Nicholas would testify that she took notes on September 25, 2007, on behalf of Wawanesa. These notes, according to defendant's counsel, would show that defendant did not claim that the Rolex or the diamond bracelet were stolen in the burglary:

> "[Defendant's counsel]: The exculpatory items I'm referring to are chiefly two things. Number one is notes that [Nicholas] took on September 25th of '07. And these are logged in notes to an activity log report produced by Wawanesa Insurance. And in those notes, for that particular date, she indicates that the two jewelry items of significance were the two that were recently scheduled with the underwriting department.[FN4] And it says she advised the insured of the jewelry limit for the remaining jewelry items. And she says that basically [defendant] says the remaining jewelry is only about $700 worth as opposed to what would be the price of a Rolex watch or a bracelet that were claimed on that Wawanesa claim. And the second item is another log-in entry on December 19 of '07 from [Nicholas]. And she said that she received a report from Diamond International for the replacement cost of the three scheduled jewelry items and that total cost of the replacement was $11,798.63, which would not include a gold Rolex watch or a bracelet. And in that sense I think that it was exculpatory and that I should have made sure that she was here."
>
> [FN4] Defendant's counsel later explained that the "recently scheduled" items referred to in the log entry were a cross pendant and two rings.

The record shows that the first time defendant's counsel spoke to Nicholas about this evidence was the night before closing arguments. Defendant's counsel stated that the jury should have heard this evidence and "I made a mistake by relying on the prosecution's subpoena." Defendant claims that his counsel's failure to subpoena Nicholas—and failure to interview her until the night before closing arguments were scheduled—amounted to ineffective assistance of counsel.

(LD C at 10-11, 14-15; see RT at 235-36, 261-69.) The appellate court proceeded to deny Petitioner's claim, stating:

Despite the outcome, the record shows that defendant's counsel made reasonable efforts to bring Nicholas to court. Nicholas was admittedly under subpoena by the prosecution. It had been the prosecution's intention to call her as a witness, but Nicholas was not willing or able to travel from San Diego due to a medical condition. In fact, defendant's counsel confirmed that Nicholas was unable to attend. Thus, even if defendant's counsel had subpoenaed Nicholas, there is no reason to believe that the subpoena would have secured Nicholas's presence at trial. Defendant's counsel reasonably believed that Nicholas would appear on the prosecution's subpoena; a second subpoena would not have made it more likely that Nicholas would attend trial.

Furthermore, even if defendant's counsel's performance was deficient in failing to subpoena Nicholas, defendant has not shown that any such failure was prejudicial. The record shows that Nicholas evaluated defendant's sworn loss statement, which was completed on October 1, 2007. The prosecution presented evidence that defendant met with Scholten on October 7, 2007, and at that meeting defendant claimed the watch and the bracelet had been taken in addition to the items listed on the initial sworn loss statement. Further, the prosecution presented evidence that in March 2008, defendant again claimed that the watch and bracelet were taken and that these items should have been included on the initial loss statement sheet. Thus, the jury was already aware that defendant had not initially listed the Rolex watch and the diamond bracelet as part of his claim of loss. The jury heard that those items were added to the claim later, during the October 2007 meeting with Scholten and during an interview under oath in March 2008. Nicholas's testimony was cumulative of what the jury already

knew—defendant did not initially claim the Rolex and diamond bracelet were lost in the burglary, but did so later, on two occasions. Because Nicholas's testimony was insufficient to create a reasonable doubt, defendant suffered no prejudice by his counsel's failure to call her. (See, e.g., *People v. Dunn*, *supra*, 205 Cal.App.4th at p. 1101 [duplicative testimony would not have altered outcome of case].)

In sum, defendant has failed to show that his counsel's failure to call Nicholas constituted deficient performance, or that any such deficient performance was prejudicial.

(LD C at 15-16.)

**2. Analysis**

A failure by trial counsel to conduct a reasonable investigation and present mitigating evidence may constitute ineffective assistance of counsel. Rompilla v. Beard, 545 U.S. 374, 383-84 (2005). In presenting a claim of ineffective assistance based on counsel's failure to call witnesses, the petitioner must identify the witness, United States v. Murray, 751 F.2d 1528, 1535 (9th Cir.), cert. denied, 474 U.S. 979 (1985); show that the witness was available and willing to testify, United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir.), cert. denied, 488 U.S. 910 (1988); and show that the witness's testimony would have been sufficient to create a reasonable probability that the jury would have had a reasonable doubt as to guilt, Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990), cert. denied, 498 U.S. 1091 (1991).

Here, the California Court of Appeal reasonably rejected Petitioner's claim that trial counsel was ineffective for failing to subpoena Nicholas to testify at trial. (LD C at 14-16.) As an initial matter, Petitioner has not provided any competent evidence, as he must, showing that Nicholas was actually available and willing to testify. See Harden, 846 F.2d at 1231-32; White v. Ollison, 592 F.Supp.2d 1227, 1250 (C.D. Cal. 2008). Generally, these requirements are satisfied by an affidavit or declaration from the witness. Dows v. Wood, 211 F.3d 480, 486 (9th Cir.), cert. denied, 531 U.S. 908 (2000). Petitioner has not provided

1  any evidentiary support demonstrating Nicholas's availability and willingness to testify. To
2  the contrary, the record shows Nicholas was already under subpoena by the prosecution,
3  and she told the prosecution she would not be able to attend due to medical restrictions.
4  (RT at 235-36, 261-62.) Nonetheless, defense counsel contacted her the night before
5  closing arguments, attempted to see if she was feeling better, and tried to have her come to
6  court voluntarily. (RT at 236, 261-62, 266.) However, "Nicholas was unable to make it[.]"
7  (RT at 263.) Therefore, this claim is without merit. See Sandgathe v. Maass, 314 F.3d 371,
8  379 (9th Cir. 2002) (affirming denial of ineffective assistance of counsel claim when
9  petitioner presented no evidence supporting claim); Harden, 846 F.2d at 1231-32 (rejecting
10 ineffective assistance of counsel claim when "[t]here is no evidence in the record which
11 establishes that [the witness] would testify in [defendant's] trial").

12       Moreover, even if counsel's performance was deficient in failing to subpoena
13 Nicholas, Petitioner has not shown that he suffered any prejudice from the witness's failure
14 to appear at trial. To the contrary, as the California Court of Appeal reasonably found, the
15 jury was already aware of the information Nicholas would have allegedly provided: that
16 Petitioner did not initially list the Rolex watch and diamond bracelet as part of his claim of
17 loss. (See RT at 180, 185-86, 191-193, 197-204; see also id. at 264-65.) Thus, Nicholas's
18 potential testimony was cumulative to what the jury already knew. Because the witness's
19 duplicative testimony would have been insufficient to create a reasonable probability of
20 reasonable doubt on the part of the jury, Petitioner suffered no prejudice by his counsel's
21 failure to call the witness. Tinsley, 895 F.2d at 532.

22       This Court is not reviewing Petitioner's ineffective assistance claim de novo, but is
23 reviewing the objective reasonableness of the California Supreme Court's rejection of the
24 claim. Under AEDPA, state court decisions must be given the benefit of the doubt.
25 Woodford v. Visciotti, 537 U.S. 19, 24 (2002). "[A] state court must be granted a deference
26 and latitude that are not in operation when the case involves review under the *Strickland*
27 standard itself." Richter, 131 S.Ct. at 785. To obtain relief, Petitioner must show that the
28 California Supreme Court's rejection of his ineffective assistance claim "was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. Petitioner has not met this extremely demanding standard. See id. at 786 ("If this standard is difficult to meet, that is because it was meant to be.")

Accordingly, the California Supreme Court's rejection of Petitioner's ineffective assistance claim was not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Petitioner's sole claim for federal habeas relief must be denied.

## ORDER

Petitioner is not entitled to relief on the claim in his FAP.

Accordingly, IT IS HEREBY ORDERED that the FAP is denied, and Judgment shall be entered dismissing this action with prejudice.

DATED: June 2, 2014                    /s/John E. McDermott
                                                               JOHN E. MCDERMOTT
                                      UNITED STATES MAGISTRATE JUDGE